STATE of Iowa, Appellee,

v.

Charles JACOBS, Appellant.

No. 98–1638.

Supreme Court of Iowa.

March 22, 2000.

David L. Hammer, Angela C. Simon, and Scott J. Nelson of Hammer, Simon & Jensen, Dubuque, for appellant.

Thomas J. Miller, Attorney General, Kevin Cmelik, Assistant Attorney General, Fred M. McCaw, County Attorney, and Christine Corken, Assistant County Attorney, for appellee.

Considered by LARSON, P.J., and LAVORATO, SNELL, TERNUS, and CADY, JJ.

SNELL, Justice.

Following a trial to the district court, the defendant, Charles H. Jacobs, was found guilty of eight counts of first-degree theft, six counts of second-degree theft, one count of third-degree theft, six counts of money laundering, one count of perjury, four counts of first-degree fraudulent practice, one count of second-degree fraudulent practice, one count of falsifying a public document, and two counts of forgery. On appeal, he contends there was insufficient evidence to support the verdict, the constitutional prohibition against double jeopardy was violated by the entry of judgment on all of the offenses, he was deprived of a fair trial due to prosecutorial misconduct, and the sentencing court failed to give reasons for the sentences it imposed. We affirm the convictions, vacate the sentences, and remand the case for resentencing.

## I. Sufficiency of the Evidence

 The defendant raises several arguments in support of his contention that the trial court's verdicts were not supported by sufficient evidence. Our review is on assigned error. *State v. Canas,* 597 N.W.2d 488, 494 (Iowa 1999). We view the evidence in the light most favorable to the State but consider all of the evidence, not just that which supports the verdict. *Id.* We will uphold a verdict if it is supported by substantial evidence. *See id.* Evidence is substantial if it could convince a rational trier of fact the defendant is guilty of the crime charged beyond a reasonable doubt. *Id.*

### A. Insanity and Diminished Responsibility Defenses

The defendant first contends the trial court erred in finding he had not proven his defenses of insanity and diminished responsibility. A review of the record reveals the defendant practiced law in Dubuque, Iowa. He served as a juvenile court referee and a judicial hospitalization referee from 1984 to 1989, and thereafter re-

turned to private practice. There was evidence that during his tenure on the bench and later as a private practitioner the defendant sometimes engaged in intemperate behavior and was prone to believe that others were conspiring against him.

During the time period from May 1992 through February 1997, the defendant was involved in several probate matters and served as an attorney for the Marcella Garthwaite and Melvin C. Ward estates. He acted as the executor and attorney for the Rose Adams estate, and he served as the attorney for the guardians and conservators of Edgar Holl.

By March 1997 a criminal investigation had commenced into the defendant's handling of the Ward estate. When questioned under oath on March 3, 1997, the defendant lied about the status of the funds in the estate. The defendant voluntarily hospitalized himself on March 6, 1997.

On March 10, 1997, Robert D. Klauer, the chair of the Grievance Committee of the Dubuque County Bar Association, filed an application for the temporary suspension of the defendant's license to practice law pursuant to Court Rule 118.16 (disability suspension). Five individuals, including the county attorney, Fred McCaw, and his assistant, Ralph Potter, filed affidavits in support of the application. Mr. McCaw's and Mr. Potter's joint affidavit was dated March 7, 1997. The defendant's license was temporarily suspended by this court on March 11, 1997.[1]

On March 14, 1997, an application alleging the defendant suffered from a serious mental impairment was filed by Alfred Hughes, the defendant's friend and former law associate. Iowa Code § 229.6 (1997). The defendant stipulated that he was seriously mentally impaired and a commitment order was filed March 19, 1997.

In July 1997, the State filed four trial informations alleging the defendant had committed nine counts of first-degree theft, five counts of second-degree theft, one count of third-degree theft, six counts of money laundering, one count of perjury, four counts of first-degree fraudulent practice, one count of second-degree fraudulent practice, one count of falsifying a public document, and two counts of forgery arising from the defendant's handling of the Ward, Adams, and Garthwaite estates and the Holl conservatorship. The defendant filed a notice indicating his intent to rely on the defenses of insanity and diminished responsibility. He waived his right to a jury trial and the matter was tried to the bench.

The trial lasted eight days and produced nine volumes of transcript. Relying on a large number of witnesses and exhibits, the State meticulously documented the defendant's thefts from his clients and his elaborate efforts to conceal the transactions. The State presented evidence of over 150 transactions in which the defendant stole money from the estates and the conservatorship and concealed the transactions. The defendant took over $185,000 for his own personal benefit. Among other things, the evidence revealed he used the funds to travel, to acquire assets, to pay bills, and to make contributions to political, civic, and charitable organizations. On many occasions, the defendant used money orders, cashier's checks, or the bank account of a person with whom he had an office-sharing arrangement to conceal the source of the funds. In some instances, the defendant resorted to forgery and the filing of false reports with the court to conceal the crimes he had committed.

The defendant did not dispute any of the State's evidence regarding his use of funds from the estates and the conservatorship. With one exception, the trial court found the State had proven beyond a reasonable doubt that the defendant had committed all of the acts charged in the trial informa-

---

1. The temporary suspension was continued in an order filed March 17, 1997. The defendant's license was also temporarily suspended pursuant to Court Rule 118.14 (suspension upon conviction of crime) on October 16, 1998.

tions. The single exception involved a charge of first-degree theft in which the court found the State had only proven the lesser offense of second-degree theft.

Rather than contest the factual basis for the State's charges, the defendant asserted the defenses of insanity and diminished responsibility. The insanity defense is codified in Iowa Code section 701.4. It provides:

A person shall not be convicted of a crime if at the time the crime is committed the person suffers from such a diseased or deranged condition of the mind as to render the person incapable of knowing the nature and quality of the act the person is committing or incapable of distinguishing between right and wrong in relation to that act. Insanity need not exist for any specific length of time before or after the commission of the alleged criminal act. If the defense of insanity is raised, the defendant must prove by a preponderance of the evidence that the defendant at the time of the crime suffered from such a deranged condition of the mind as to render the defendant incapable of knowing the nature and quality of the act the defendant was committing or was incapable of distinguishing between right and wrong in relation to the act.

This statute incorporates the *M'Naghten*[2] standard previously adopted by this court as a common law rule. *State v. McVey*, 376 N.W.2d 585, 587 (Iowa 1985). The words "right" and "wrong" refer to a legal, not moral, right or wrong. *State v. Collins*, 305 N.W.2d 434, 436 (Iowa 1981).

 The diminished responsibility defense is a common law doctrine that permits proof of a defendant's mental condition on the issue of the defendant's capacity to form a specific intent in those instances in which the State must prove a defendant's specific intent as an element of the crime charged. *McVey*, 376 N.W.2d at 586. The diminished responsibility defense is not available for a crime that requires only a general criminal intent. *Id.*

Both the defendant and the State offered testimony regarding the defendant's mental condition. All agreed the defendant suffered from bipolar affective disorder, manic type. The illness is characterized by symptoms of depression and mania in which there is a discernable change in a person's level of functioning and mood and a marked impairment in the person's ability to carry out his work or day-to-day living activities.

Dr. Kishore Thampy began treating the defendant on February 28, 1997. Dr. Thampy was of the opinion that the defendant began to suffer from the disorder in 1988 and it became a full blown manic psychotic episode in December 1996 and January 1997. The doctor claimed a person could organize and conceal complicated financial transactions even while suffering from bipolar affective disorder. Dr. Thampy testified that from the time the disease surfaced in 1988 the defendant could not form a specific intent, did not know the nature of his acts, and could not distinguish right from wrong.

Dr. Thomas Piekenbrock testified he had prescribed the defendant a medication for the treatment of mild anxiety after the defendant left the bench in 1989. Dr. Piekenbrock did not examine the defendant for the purpose of determining his sanity and the doctor expressed no opinion on the question of the defendant's mental state. The defense questioned the doctor in general about bipolar disorder. The doctor agreed that a person could be quite crafty and could try to conceal things during a manic phase of bipolar affective disorder. However, Dr. Piekenbrock testified theft was not a characteristic of bipolar disorder. He indicated that because a person with the disorder already believes he has sufficient resources to pay for his excessive spending, the person does not concern himself with whether he has the funds to cover his expenditures.

**2.** *M'Naghten's Case,* 10 Clark & F. 200, 210, 8 Eng. Rep. 718, 722 (1843).

Dr. Michael Taylor testified on behalf of the State. He agreed the defendant suffered from bipolar affective disorder with manic episodes beginning in the fall of 1996. Dr. Taylor testified there could be instances in which a person was severely ill enough from mania that he would meet the *M'Naghten* test or could establish a defense of diminished responsibility. However, Dr. Taylor was of the opinion that, despite the defendant's mental illness, the defendant understood the quality of his acts, knew the difference between right and wrong, and could form a specific intent during the period in which he committed the criminal acts charged by the State.

In reaching this opinion Dr. Taylor relied on several factors, including the observations of the defendant's secretary and an attorney with whom he shared office space. Despite working with the defendant on a daily basis, neither of those individuals had observed abnormalities in the defendant's ability to function.

Dr. Taylor cited the medical records of Dr. Piekenbrock who had prescribed a drug for the defendant for anxiety and who had not noted any signs of serious mental problems before January 1997. Dr. Taylor examined a sworn statement the defendant had made on March 3, 1997, and noted that the defendant had not shown any disorganization of thoughts or any difficulty concentrating during the seventy-five minute interview. Finally, Dr. Taylor testified that a person who was experiencing a severe episode of mania could not have carried out the complex financial transactions completed by the defendant. Dr. Taylor believed it was inconceivable the defendant could have planned, organized and concealed the transactions while experiencing an episode of mania.

While the trial court found the defendant suffered from bipolar affective disorder, it held he had not proven his defenses of insanity and diminished responsibility. In its ruling the court examined the testimony of each of the doctors. The court was concerned that Dr. Thampy's opinion was undermined by the fact that the doctor was not fully aware of the extent of the efforts the defendant had taken to conceal his illegal activities. The trial court observed that the defendant's conduct was inconsistent with Dr. Piekenbrock's opinion that theft was not characteristic of bipolar disorder. Had the defendant really believed he already had the money necessary to fund his expenses, he would not have needed to engage in the intricate transactions he used to cover up the thefts. The court concluded the defendant had not proven he lacked the capacity to form the requisite intent, and he had not proven he did not know the nature of his acts and could not distinguish right from wrong at the time he committed the criminal acts.

When conflicting psychiatric testimony is presented to the fact finder, the issue of sanity is clearly for the fact finder to decide. *See State v. Fetters,* 562 N.W.2d 770, 775 (Iowa App.1997). The trial court as trier of fact is not obligated to accept opinion evidence, even from experts, as conclusive. *State v. Venzke,* 576 N.W.2d 382, 384 (Iowa App.1997). When a case evolves into a battle of experts, we, as the reviewing court, readily defer to the district court's judgment as it is in a better position to weigh the credibility of the witnesses. *Id.*

The defendant claimed that from May 1992 through February 1997, he did not know the nature of his criminal acts, could not distinguish right from wrong, and lacked the capacity to form a specific intent. Based on the medical evidence, the opinions of the psychiatric experts, and the observations of those who encountered the defendant on a regular basis, there was sufficient evidence to support the trial court's rejection of the insanity and diminished responsibility defenses.

### B. Character Evidence

Citing language from Iowa Criminal Jury Instruction 200.38, the defendant argues the evidence of his good character, when combined with evidence of his mental

illness, raised a reasonable doubt as to his guilt. The defendant contends that given the sheer weight of the evidence of his good character, the only conclusion the trial court could reach was that his criminal acts were the result of his mental illness and he should have been acquitted.[3]

 This court has previously recognized that "[a] defendant in a criminal case may elect to put his character in issue by producing evidence as to his good character as bearing on the probability or nonprobability of his guilt of the crime charged." *State v. Hobbs*, 172 N.W.2d 268, 271 (Iowa 1969). This principle is based upon the philosophy that a person of good character would not be likely to commit the crime of which he is accused. *Id.*

The defendant did not dispute any of the State's evidence regarding his use of funds from the estates and the conservatorship, and there was no question he committed the criminal acts alleged by the State. Unlike a typical defendant who offers character evidence to establish that he would not be likely to commit the crimes charged, the defendant offered character evidence to buttress his claims that he had been insane or suffered from diminished capacity.

This court addressed a similar situation in *State v. Hamann*, 285 N.W.2d 180 (Iowa 1979). There a defendant had admitted firing the fatal shots which led to a murder charge, and he offered character evidence "not to negative the act itself, but to prove insanity." *Hamann*, 285 N.W.2d at 184. In effect, the defendant in *Hamann* want-

ed to rely on evidence of his good character to establish that "he must have been insane to do such a thing." *Id.* This court held the *Hamann* jury had been sufficiently instructed on the issue of sanity, and the defendant was not entitled to extend the good character rule any further. *Id.* at 184–85.

It was unquestioned the defendant committed the acts alleged by the State, and the only disputed question was whether he had established the defenses of insanity or diminished responsibility. We have already concluded adequate evidence supported the court's rejection of the defenses. While evidence of the defendant's character was relevant, it was not dispositive. The trial court applied the proper standards for determining insanity and diminished responsibility, and its findings must be affirmed.

## II. Judicial Estoppel

 Prior to trial, the defendant filed an "Objection to Continued Prosecution" and sought dismissal of the case. He claimed that because the involuntary commitment proceedings resulted in a finding that he was seriously mentally impaired, the State was estopped from challenging his insanity and diminished responsibility defenses at trial. The defendant claimed the State could not take a position inconsistent with that which it took at the commitment proceedings. The district court rejected the defendant's argument, concluding the determination of whether the

---

**3.** Iowa Criminal Jury Instruction 200.38 provides:

**Character And Reputation Evidence.** Evidence has been received concerning the defendant's [character] [reputation] for (*trait used should be inserted here*). This evidence should be considered with all other evidence in determining the guilt or innocence of the defendant.

If you find the defendant's [character] [reputation] as to (*trait*) is good, you may consider this evidence in determining whether a person of such [character] [reputation] for (*trait*) would be likely to commit the crime charged.

If the evidence of such good [character] [reputation] as to (*trait*) is good enough, together with all of the other evidence, to raise a reasonable doubt as to the defendant's guilt, [he][she] must be acquitted, even though without such proof of good [character] [reputation] the jury would convict.

However, the defendant's previous good [character] [reputation] as to (*trait*) is not a defense if you find by evidence beyond a reasonable doubt that the defendant committed the crime charged.

defendant was seriously mentally impaired on March 19, 1997, was different from the question of whether he was insane or suffered from diminished responsibility at the time the criminal acts were alleged to have occurred.

The doctrine of judicial estoppel prohibits a party who successfully and unequivocally asserts a position in one judicial proceeding from asserting an inconsistent position in a subsequent proceeding. *Roach v. Crouch*, 524 N.W.2d 400, 403 (Iowa 1994). A fundamental feature of the doctrine, however, is the successful assertion of the inconsistent position in the earlier action. *Id.*

At the outset, we note that the State's role in the involuntary commitment proceedings was limited. The application was filed by Alfred E. Hughes, the defendant's friend and former law associate. The county attorney is statutorily required to present evidence in support of a commitment application at a hospitalization hearing. Iowa Code § 229.12. However, the record reveals the Dubuque County Attorney's office did not plan to participate in any contested proceedings and intended to arrange for another county attorney or the Attorney General's office to prosecute the commitment proceedings if that became necessary. As it turned out, the defendant stipulated he had a serious mental impairment and the issue of his mental·status was never litigated.

It is apparent from our review of the record that the defendant's claim of judicial estoppel is without merit. The State did not assert *any* position at the commitment proceedings, let alone a position contrary to that which it asserted in the later criminal proceedings. Assuming, *arguendo* that the State's agreement to the stipulation could be construed as the assertion of a position, the defendant's argument still fails. The determination of whether one is seriously mentally impaired, Iowa Code section 229.1(14), involves the application of a different legal standard (and a

different standard of proof) than those used in determining if a criminal defendant was insane or suffered from diminished capacity. *See* Iowa Code §§ 229.1(15), 229.12, 701.4; *see also Edwards v. State*, 328 Ark. 394, 943 S.W.2d 600, 604 (1997) (defendant's prior civil commitment did not collaterally estop state from challenging his capacity to form culpable intent at subsequent criminal proceeding because the two issues presented differing standards for mental illness). The principle of judicial estoppel was not applicable in this case and the district court properly denied the defendant's request to dismiss the case.

### III. Double Jeopardy

The defendant argues the entry of judgment on all of the counts of which he was found guilty violates the constitutional prohibition against double jeopardy. U.S. Const. amend. V. He contends many of the theft, fraudulent practice, and money laundering counts were grounded in the same underlying facts and circumstances and convicting him on each separate offense is unconstitutional because he will incur multiple punishments for the same act. He alternatively argues that all of the charges of theft and fraudulent practice were part of the same course of action and the "continuing offense doctrine" prohibits multiple convictions of a defendant who commits only one continuous offense.[4]

The Double Jeopardy Clause protects against three distinct constitutional violations. *State v. Rater*, 568 N.W.2d 655, 662 (Iowa 1997). It protects against successive prosecutions after acquittal, successive prosecutions after conviction, and multiple punishments for the same offense. *State v. Perez*, 563 N.W.2d 625, 627 (Iowa 1997). This protection is binding on the states through the Fourteenth Amendment to the federal constitution. *Benton v. Maryland*, 395 U.S. 784, 794, 89 S.Ct. 2056, 2062, 23 L.Ed.2d 707, 716

---

**4.** The defendant does not argue, nor could he under the present record, that he was convict-ed of lesser-included offenses required to be merged under Iowa Code section 701.9.

(1969). Our review is de novo. *Perez*, 563 N.W.2d at 627.

The defendant's claims are without merit. The Double Jeopardy Clause of the United States Constitution provides that no person shall "be subject for the *same offense* to be twice put in jeopardy of life or limb." U.S. Const. amend. V (emphasis added). The defendant complains that by punishing him for the offenses of theft, money laundering, and fraudulent practice in conjunction with the theft of a single amount of money, he has been punished three times for the same offense.

Upon our de novo review of the record, we conclude the facts of this case do not implicate the Double Jeopardy Clause. "[M]ultiple punishments can be assessed after a defendant is convicted of two offenses that are not the same." *State v. Smith*, 573 N.W.2d 14, 19 (Iowa 1997). Where the sentences imposed are based on distinct acts, there is no double jeopardy problem. *See id.*

The defendant engaged in numerous, separate, transactions in connection with each theft, and each of the transactions constituted a separate offense. For example, on May 10, 1994, the defendant wrote a $5000 check (# 1124) from the Adams estate payable to American Trust and Savings Bank. He used the proceeds from the check to acquire a blank cashier's check (# 620523). The defendant completed the cashier's check and used it to pay one of his clients a $5000 advance for a settlement in a workers' compensation case. The defendant's issuance of the check from the estate constituted a theft, and his subsequent use of a cashier's check in order to conceal the source of his funds constituted money laundering.

The defendant utilized a similar practice with money orders as illustrated by his actions on May 24, 1996. On that date, the defendant wrote a $500 check from the Adams estate payable to American Trust and Savings Bank (check # 1326). He then used the proceeds from that check to have the bank issue a blank $500 money order (# 65712). The defendant completed the money order and used it on his own behalf. In this case the money order was made out to the Riverboat Museum to pay for the defendant's membership in the museum's "Pilot's Club."

Each time the defendant improperly took funds from his client he committed a theft. When he used cashier's checks and money orders to conceal the source of his funds he committed money laundering. When he subsequently falsely reported such transactions in probate reports and other court documents he committed fraudulent practices. Since the sentences imposed on these transactions were based on separate and distinct acts, there is no double jeopardy violation.[5]

The defendant's claim of a "continuous offense" violation is also without merit. Under the Double Jeopardy Clause, the "continuous offense" doctrine prohibits multiple convictions of a defendant who commits only one continuous offense. *Rater*, 568 N.W.2d at 662.

The test for determining whether the continuous offense doctrine applies "is whether the individual acts are prohibited, or the course of action which they constitute. If the former, then each act is punishable separately.... If the latter, there can be but one penalty."

*State v. Aguiar–Corona*, 508 N.W.2d 698, 704 (Iowa 1993) (quoting *Blockburger v. United States*, 284 U.S. 299, 302, 52 S.Ct. 180, 181, 76 L.Ed. 306, 308 (1932)).

We have indicated a particular offense should not be construed as a "continuing" offense unless the explicit language of the substantive criminal statute compels such a conclusion, or the nature of

---

**5.** The defendant contends it is "illogical" to think that the legislature intended to punish him for all of the offenses he committed in connection with each theft. However, we have previously recognized that by enacting separate statutes the legislature may address "separate evils" even when the offenses grow out of the same incident. *See State v. Butler*, 415 N.W.2d 634, 637 (Iowa 1987).

the crime involved is such that the legislature must assuredly have intended that it be treated as such. *See Rater*, 568 N.W.2d at 663. The defendant concedes the State was not required to aggregate the defendant's thefts in one charge. *See* Iowa Code § 714.3; *State v. Chrisman*, 514 N.W.2d 57, 59 (Iowa 1994). Nothing in the statutory language of the theft and fraudulent practices statutes indicates they were intended to be ongoing offenses. *See* Iowa Code §§ 714.1, 714.8. The continuing offense doctrine did not apply and there was no violation of the Double Jeopardy Clause.

## IV. Prosecutorial Misconduct

The defendant argues he was denied a fair and impartial trial due to prosecutorial misconduct and he claims he is entitled to a new trial. In support of this argument, the defendant cites extra judicial statements allegedly made by the county attorney, the affidavit filed by the county attorney in support of the suspension of the defendant's law license, the State's motion to quash a subpoena the defendant had issued to a local television station, and the State's March 3, 1997, interview of the defendant.

▇▇▇ Trial courts have broad discretion in ruling on claims of prosecutorial misconduct and we review such rulings for an abuse of discretion. *State v. Greene*, 592 N.W.2d 24, 30 (Iowa 1999). We find an abuse of discretion only where there is misconduct and the defendant was so prejudiced by the misconduct as to deprive him of a fair trial. *Id.*

There were pretrial proceedings relevant to some of the matters of which the defendant now complains.[6] The trial court ruled on each of those matters and the defendant is *not* directly challenging those rulings on appeal. Instead, he argues those matters, when considered cumula-

tively, now give rise to a claim of prosecutorial misconduct.

▇▇▇ The defendant has failed to demonstrate there was any prosecutorial misconduct, and even if there was misconduct the defendant has failed to establish that he was so prejudiced as to warrant a new trial. In the evidentiary context, we have previously observed there is less danger of unfair prejudice when a matter is tried to the court. *See State v. Casady*, 491 N.W.2d 782, 786 (Iowa 1992). Likewise, we believe any risk of prejudice resulting from a prosecutor's alleged misconduct was mitigated by the fact that this matter was tried to the court.

A review of the trial court's rulings indicate it carefully balanced the competing interests relevant to the defendant's motion to enjoin extra judicial statements. The court correctly held there was no constitutional basis to support the defendant's motion to suppress, and that issue does not support a claim of prosecutorial misconduct.

We reject the defendant's argument that the county attorney filed an affidavit in support of the suspension of the defendant's law license in order to attain an improper advantage in the criminal proceedings. The county attorney testified it had come to his attention in March 1997 that funds entrusted to the defendant were being rapidly depleted and the defendant was suffering from a mental impairment. He explained that he did not know how many estates were affected by the defendant's thefts and that only by obtaining a disability suspension could it be assured that all of the estates (presently known or unknown) would be protected from further thefts. Given the urgency of the situation and the county attorney's familiarity with the facts, his conduct was prudent. The defendant's claim that the prosecutor used the disability suspension to gain an im-

---

6. The defendant filed a pretrial motion to enjoin the county attorney from making extra judicial comments as well as a motion to suppress the defendant's March 3 statements. The defendant also resisted the State's motion to quash his subpoena and its request for sanctions.

proper advantage in the criminal proceedings is without merit.

Although we find the defendant was not prejudiced by the various acts of alleged prosecutorial misconduct, we do express reservations about one aspect of the State's actions. In conjunction with its motion to quash, the State requested the imposition of sanctions against defense counsel. The request for sanctions could be construed as an effort to chill the advocacy and efficacy of defense counsel. However, we are satisfied from our review of the entire record that the effectiveness of defense counsel in this case was not compromised. In fact, their forceful advocacy and superlative presentation of the psychiatric evidence is to be commended.

## V. Sentencing

Finally, the defendant argues the sentences imposed by the district court are contrary to law. He contends the court failed to give sufficient reasons for the sentences it imposed. The defendant claims the court cited only the nature of the offense as the reason for its sentence and that factor, alone, cannot be determinative. He also contends the court failed to give reasons for imposing consecutive sentences.

■ Iowa Rule of Criminal Procedure 22(3)(d) requires a trial court to state on the record its reasons for selecting a particular sentence. *State v. Oliver*, 588 N.W.2d 412, 414 (Iowa 1998). Although the reasons need not be detailed, at least a cursory explanation must be provided to allow appellate review of the trial court's discretionary action. *Id.* A trial court must also give reasons for its decision to impose consecutive sentences. *See id.; State v. Harrington*, 349 N.W.2d 758, 763 (Iowa 1984).

The presentence investigator had recommended the defendant receive a suspended sentence and defense counsel concurred in that recommendation. The State recommended a combination of consecutive and concurrent sentences which would result in thirty-five years of incarceration.

■ The trial court imposed a combination of consecutive and concurrent sentences which would result in a total period of incarceration not to exceed thirty years. In explaining its reasons for the sentences imposed, the court noted that the defendant's actions were "despicable" and "cold and calculated" and that they had taken place over a period of five years. The court observed that the defendant preyed upon the weak and "the very people who could least afford it." The court noted the defendant's actions had been planned and were conducted to make him a "high roller" and "a big player in the community." The sentencing court found the defendant's victims, the community, and the legal profession had all suffered because of his actions. The court concluded the defendant should be incarcerated and it stated "You're not being sent to prison because you're an attorney. You're being sent to prison because you're a thief."

■ The district court provided sufficient reasons to support its decision to impose a term of incarceration rather than a suspended sentence. It cited the nature of the offenses, their ongoing nature, the defendant's violation of his fiduciary and professional duties, and the effect of the crimes on the victims and the community. However, the court did not provide reasons for its decision to impose consecutive sentences. *See Harrington*, 349 N.W.2d at 763 (sentence vacated where court failed to state reasons for imposing consecutive sentences). The convictions of the district court are affirmed, the sentences vacated, and the case remanded for resentencing.

**CONVICTIONS AFFIRMED, SENTENCES VACATED, AND CASE REMANDED FOR RESENTENCING.**